**In re Dawn PETERSEN, Debtor.**

**David Birdsell, Trustee, Plaintiff,**

**v.**

**David A. Petersen, Defendant.**

**Bankruptcy No. 02–01937–PHX–SSC.
Adversary No. 02–0576.**

United States Bankruptcy Court,
D. Arizona.

Sept. 20, 2006.

Lawrence D. Hirsch, Hirsch Law Office, P.C., Scottsdale, AZ, for Debtor.

## MEMORANDUM DECISION

SARAH SHARER CURLEY, Bankruptcy Judge.

### I. *Preliminary Statement*

The United States District Court for District of Arizona remanded certain issues in this adversary for resolution by this Court.[1] This Court did conduct a trial

---

1. The United States District Court Decision may be reviewed at Docket Entry No. 44.

on the remanded issues on May 9, 2005. However, at the conclusion of the trial, this Court filed a memorandum decision dated August 15, 2005, noting that neither side had presented sufficient evidence for the Court to resolve the issues which had been remanded to it. Moreover, additional issues arose during the remand trial which had to be resolved by this Court.[2] As a result, further discovery was conducted in this matter.[3] Extensions were granted to complete the discovery, and Mr. Petersen retained counsel. The Court did conduct a further trial on the remanded issues on May 17, 2006, and the parties filed post-trial memoranda on the issues on May 26, 2006. Thereafter this matter was deemed under advisement. This Decision shall constitute the Court's findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52, Bankruptcy Rule 7052. The Court has jurisdiction over this matter, and this is a core proceeding. 28 U.S.C. §§ 1334 and 157 (West 2006).

## II. Background[4]

David and Dawn Petersen were married on December 4, 1992. On April 10, 2000, Dawn Petersen, the Debtor herein, served divorce papers on her husband. The Debtor filed her Chapter 7 bankruptcy petition on February 8, 2002.

Because the Arizona Superior Court, which was handling the domestic relations proceedings of the Petersens, did not resolve the issue of how to distribute the sole and separate property and the community property of the Petersens, many of these issues remained for the Bankruptcy Court to decide. The bankruptcy trustee ultimately believed that Mr. Petersen had retained property or funds which belonged to the bankruptcy estate and commenced this adversary proceeding on April 12, 2002, seeking a judgment from this Court that Mr. Petersen turn over that portion of the community property which belonged to the Debtor and, hence, was property of this bankruptcy estate.

During most of the marriage, the couple lived in the residence located at 841 E. Desert Park Lane, Phoenix, Arizona 85020 ("Subject Property" or "Property"). Mr. Petersen inherited the Subject Property from his mother, which Property was transferred to him in July 1993 with a value of $180,000. During the marriage, the couple spent community funds remodeling and updating the Property. Initially this Court made a finding that the couple expended the amount of $20,996.61 remodeling or updating the property at the first trial before this Court.[5] However, subsequent disclosures made to this Court during the remand process led this Court to believe that insufficient or inaccurate information had been presented to the Court by both parties and that the factual finding was clearly erroneous. The matter was further complicated by the fact that the Subject Property was sold by Mr. Petersen in early 2004.[6] Based upon further

*Also* see Exhibit A.

2. *See* Docket Entry No. 110 for this Court's decision. Also *see* Exhibit C.

3. *See* Docket Entry No. 114 and 118.

4. The Background Information has been taken from this Court's original Memorandum Decision, dated March 28, 2003, which was appealed to the District Court, and from the District Court's Decision which is Exhibit A in the record. To the extent necessary, this Court has also updated the Background Information with the proceedings or events which have occurred subsequent to the District Court's Decision.

5. *See* Memorandum Decision, Docket Entry No. 11, dated March 28, 2003 at p. 8.

6. The contract for sale was dated February 24, 2004, and the recording of the deed transferring the Property occurred on April 16, 2004.

proceedings before this Court, and this Court's Memorandum Decision dated August 15, 2005, this Court concluded that it must value the Property as of the date of sale in 2004.[7] Given the unique facts of this case, both parties obtained experts to value the improvements to the Subject Property as of the 2004 sale date. The Court re-opened discovery to allow the parties to analyze the improvements or repairs made to the Property from 1993, when Mr. Petersen acquired the Property as his sole and separate property, to the date of sale, the community funds utilized for such purposes, and the enhancement in value that might be ascribed to the improvements over the years versus the appreciation in the value of the Property due to the inherent nature of the Property. Both parties utilized experts at the second remand trial in May 2006, and this Court will discuss its factual findings and conclusions of law as a result of that evidence.

The Court also concluded that it needed to reopen the issue of whether Mr. Petersen should be entitled to any set-offs. The Court has set forth its reasons for reopening the issue in its Memorandum Decision from August 15, 2005.[8]

The parties did not dispute this Court's finding in its initial decision that community funds were utilized to make the mortgage payments on the Property.[9] The parties subsequently conferred and determined the amount of the payments to be the sum of $8,432.40.[10]

The Court also incorporates the following findings that have not been disputed by the parties.[11] Mr. Petersen owned a boat, a timeshare, rental property, and vacant land as his sole and separate property. The Defendant had a bank account with Wells Fargo (f.k.a. First Interstate) which he used before the marriage and in which he placed all of his earnings during his marriage to the Debtor. The Debtor did not place any of her earnings during the marriage into this Wells Fargo account and did not contribute any of her earnings toward the assets described above. Mr. Petersen had an IRA account with Merrill Lynch which was funded with both separate property and community property obtained during the marriage of the Debtor and the Defendant. The parties agreed that the bankruptcy estate's interest in the IRA was 19 percent of the value of the IRA. As of September 27, 2002, the value of the IRA was $59,835.46.[12] Mr. Petersen also had a cash management account which was fully funded with community funds, and had a value as of September 27, 2002, in the amount of $11,778.24. As to the cash management account, there was no controverting evidence presented that these were not community funds. The value of that account as of September 27, 2002, was the sum of $11,778.24. The Court, thus, concluded that the bankruptcy estate was entitled to one-half of this account.[13]

At the time of the parties' marriage, the Wells Fargo account had the sum of $11,397.87 in it. The balance in this account on the date that the divorce papers were served was $18,034.22. Since these

---

7.  See Docket Entry No. 110; also Exhibit C.

8.  See Docket Entry No. 110; also Exhibit C.

9.  See Memorandum Decision, Docket Entry No. 11 at pp. 8–9.

10.  See District Court Decision, Docket Entry No. 44 at p. 2.

11.  See Memorandum Decision, Docket Entry No. 11, at pp. 2–3.

12.  See Memorandum Decision, Docket Entry No. 11 at p. 9.

13.  See Memorandum Decision, Docket Entry No. 11 at p. 10.

funds were not specifically designated as separate property, and given the community assets placed into this account, the Court concluded that without the appropriate tracing, these funds should be considered community funds, with one-half of these funds, or the sum of $9,017.11, to be designated for the benefit of the bankruptcy estate.[14]

The Debtor had sold her insurance business for the sum of $48,000.00. This business was started by the Debtor after the parties' marriage. The Court concluded that Mr. Petersen was entitled to a credit of $24,000, his one-half share in that business, against any funds that he may owe the bankruptcy estate.[15]

### III. Factual Discussion on the Remanded Issues

1. *The Value of the Improvements.*

At the trial, the Trustee called Roy E. Morris III as his expert who presented a report dated October 12, 2005.[16] The parties stipulated that Mr. Morris was an expert in real estate valuation. Mr. Morris' report reflected that Ms. Patricia Ruth Petersen acquired the Property in 1976, that the Property was transferred from Carpenter, Peterson & Petersen to Mr. Petersen in June 1993, with a deed recordation date of July 30, 1993, and that Mr. Petersen sold the Property to Ramella by contract dated February 24, 2004, with a deed recordation date of April 16, 2004.[17]

Mr. Morris was unable to inspect the Property at the time of his report. However, at the time of trial, he testified that he had been able to inspect the property on November 18, 2005, but his opinion as to the value of the improvements remained unaltered. Mr. Morris testified that he used the affidavits of Mr. Petersen and the Debtor, various receipts provided to him, Mr. Petersen's disclosures in the Multiple Listing Service when the Property was sold, and "other sources" in determining the value of the improvements. He noted that the differences in Mr. Petersen's and the Debtor's testimony or affidavits as to what had been done to the Property over the years and when, had made his task more difficult and subject to question by the Court and the parties.[18]

He noted that the Property was constructed in 1958 and was initially 1,938 square feet, but was expanded through remodeling to 2,760 square feet.[19] He noted a discrepancy between the assessor's analysis of the square footage of the home and the statement made in the Multiple Listing Service prepared by Mr. Petersen.[20] Unfortunately, by remodeling and adding a guest area, the Property lost its garage. Mr. Morris stated that Mr. Petersen's information reflected that Mr. Petersen had expended the sum of $4,900 in 1993; $23,200 in 1994; and $25,600 in 2003 improving the Property.[21] Because Mr. Petersen accomplished these improve-

---

14. *See* Memorandum Decision, Docket Entry No. 11 at pp. 9–10.

15. *See* Memorandum Decision, Docket Entry No. 11 at pp. 10–11.

16. *See* Exhibit 1.

17. *Id.* at 4. Mr. Morris did misspell Mr. Petersen's name and that of his mother in the report.

18. Testimony of Mr. Morris at trial in May 2006; also see Exhibits 1 and 2.

19. Mr. Morris did not indicate when the expansion occurred. Presumably at some time prior to 1993.

20. *See* Exhibit 1 at 9. The assessor listed the Property with square footage of 2,281, but Mr. Petersen listed the square footage at 2,760 square feet in the Multiple Listing Service.

21. *Id.* at 10.

ments without contractors, he claimed a cost of only $53,700. The Debtor, in documentation that she supplied to Mr. Morris, disputed this amount, noting that Mr. Petersen had told friends that he had expended "over $90,000" to improve the Property.[22] Mr. Morris testified that because of the dispute between Mr. Petersen and the Debtor on the costs of the improvements over the relevant time period, he was unable to resolve what had actually occurred and when. He noted that this was a weakness in his valuation report.

Mr. Morris testified that he believed that the Property sold for market value in 2004, noting that Mr. Petersen had listed the Property for $449,000 on January 13, 2004, but sold the Property for $430,000 on February 24, 2004, the date that Mr. Petersen executed the contract for sale. The neighborhood for the Property consisted of a number of homes built in the 1950's which had been remodeled over the years.[23] Mr. Morris testified that in 1999–2004, the residences in the area of the Property appreciated 56.5 percent; with the appreciation for the area being 16.1 percent in the one year from 2003–2004.[24] However, he noted that the real estate "frenzy," which included the dramatic increase in the price of homes in the Phoenix market, did not occur until after the sale of the Property. However, he conceded that for the time period from 1998 to 2003, the residences in the Subject Property's Zip Code increased in value 68.2 percent.[25]

Thus, for the time period from 1998 to 2004, the value of the residences in the Property's Zip Code increased in value 16.1 percent plus 68.2 percent or a total of 84.3 percent. However, Mr. Morris testified that said rapid increase was not due to market factors, but to almost all of the homes being remodeled. He stated that it was the improvements that were driving the valuation increase.

Mr. Morris attempted to ascribe the change in valuation, as a result of the improvements made to the Property, by analyzing comparable sales in the neighborhood of the residences that had been remodeled in a similar manner as the Subject Property with those residences that had not been remodeled over the years, but were of a comparable age and in the same area as the Property.[26]

In reviewing the comparable sale at 7825 N. 6th Street, Mr. Morris noted that the home had been remodeled in 2002. In March 1999, the home had a value of $175,000, which increased in value to $214,000 by August 2002.[27] He noted that this was an 18.6 percent appreciation from market factors during the relevant time period, or an appreciation of 5.44 percent per year. In August 2002, the home was remodeled, and on March 3, 2004, it was re-sold for $308,900, which is approximately at the same time as the Property's sale. He noted that this was a 30.4 percent increase in the price of the comparable in one and one-half years, stat-

22. *Id.*

23. *Id.* at 5.

24. He testified that he had made a mistake in his report when he described the area as the "85022" Zip Code. He had meant to describe the 85020 Zip Code, which is the Zip Code for the Property. *See* Exhibit 1 at 5 for the mistake as to the Zip Code.

25. *See* Exhibit 1 at 6.

26. *Id.* at 14.

27. *Id.* at pp. 15 and 16. There is an error in the report, since Mr. Morris listed the sale of the residence at $214,000 on Page 15, but listed a price of $215,000 on Page 16 of his report. However, the difference in the price paid for the residence in his report is not substantial and does not impact this Court's Decision.

ing that the increase in value was due to the improvements made, not the market conditions. Mr. Petersen's expert, Jan Sell, also used this same comparable in his report.[28] However, Mr. Sell simply adjusted the sale price of the comparable predicated on whether the Subject Property had a better view, site, or landscaping than the comparable, the relative square footage of the properties, the fact that the comparable had a garage and the Subject Property did not, etc. Mr. Sell made a net adjustment in the aggregate amount of $48,000 to the comparable for an adjusted sale price of $350,000. The difficulty is that this Court is unable to attribute any value to the improvements based upon Mr. Sell's analysis. Thus, between Mr. Morris' analysis and that of Mr. Sell on the same comparable, the Court concludes that it will adopt, with some modifications as set forth hereinafter, that of Mr. Morris in determining to what extent the improvements to the Subject Property, versus just the inherent nature of the Property, increased the value of the Property during the relevant time period.

Mr. Morris does include more comparable sales in his analysis. However, one home is substantially smaller than the Property and was sold in July 2003, well before the sale of the Subject Property in February 2004.[29] The difference in the comparable and the Property is highlighted by the fact that the Subject Property was transferred to Mr. Petersen for $180,000 in 1993, and the comparable only had a value of $98,000 a year later in 1994. How are two homes with such different values in 1993 and 1994 at all similar? Because the Subject Property had a superior location, site, and other amenities, the

Court rejects this comparable in its analysis. Mr. Morris also relies on a comparable that was sold in November 2003 as a "fix up." This home only had a value of $88,000 in 1987, and was sold in 2003 for $170,000. This was an increase of 3.57 percent per year over 16 years. However, it is difficult to consider this comparable as well, given such different square footage, amenities, site, landscaping, etc., between the comparable and the Subject Property. The Court is unable to draw few inferences from an analysis of such a different property in analyzing the value of the improvements to the Subject Property over the relevant time period.

Also troubling is the fact that Mr. Morris changed his opinion from when he testified at the first trial on remand. He conceded that he believed initially that the improvements made with community funds had caused an increase in value of $71,900 to the Subject Property. At the recent trial, he testified that the Subject Property had an appreciation in its value of 7.10 percent per year if it had not been remodeled.[30] With remodeling (and the improvements made with the community funds), the Property had an increase in value of 13.9 percent per year. Subtracting 7.10 percent from 13.9 percent, he concluded that the increase in value of the Property based solely on the improvements was 6.8 percent per year. He then took the original value of the home (or $180,000) when Mr. Petersen acquired it, calculated the increase in price from 1993 to 2004 at 6.8 percent per year, or a value for the home of $363,357. He then subtracted $180,000, the original value of the home in 1993, from $363,357, to arrive at an appreciation amount of $183,400 solely based on the

---

28. *See* Exhibit B at p. 11 of the complete report (marked Page 2 of 6 of the Uniform Residential Appraisal Report.)

29. Comparable sale at 630 East Winter, Exhibit 1 at 16.

30. *Id.* at 17.

improvements made to the Property.[31] The parties were married in 1992. However, Mr. Petersen did not acquire the Property until 1993. Which year was Mr. Morris focusing on? In one sentence of his report, he refers to the date of marriage as being the starting point of his analysis, in another to the date that Mr. Petersen acquired the Property. Mr. Morris also refers to the date of divorce as being important in his first analysis, but he does not refer to a particular date utilized.[32] Importantly, he increases the value of the improvements from $71,900 to $183,400 with no thorough analysis as to why that is appropriate. From the Court's standpoint, it must reconsider, with the assistance of Mr. Morris' report, what is the appropriate increase in appreciation in the Subject Property predicated solely on the improvements.

As troubling is Mr. Sell's analysis. First, he decreases the value of the Property by $30,000 because the purchaser believed that he/she paid too much for the Property.[33] The point is that Mr. Petersen listed the Property for around $449,000, and the parties agreed to a contract price of $430,000. There is no support for a further reduction in the price. Mr. Sell also states that the only improvements made to the Property were a remodel of the kitchen, the replacement of the windows, and a roof replacement.[34] The Court disagrees. The record is replete with the testimony of Mr. Petersen, including the listing that he prepared for the Multiple Listing Service, as to all of the improvements that had been made to the Property. In fact, a review of Mr. Morris' report discusses in detail the statements by Mr. Petersen for the Multiple Listing Service. Since Mr. Petersen is a real estate agent, he should be held to the representations that he made in his affidavit and for the Multiple Listing Service. Although his statements as to how the Property was improved do differ from those of the Debtor, it is also true that far more was done to the Property, through improvements, than Mr. Sell acknowledges.[35]

The Court also rejects Mr. Sell's analysis of what it would cost to improve the Property. For instance, Mr. Sell concludes that it would cost $25,000 to remodel a kitchen. There is simply no support in the record as to how he arrives at such a figure. Even if accurate, would that improvement not cause the Property to have some increase in value which is separate from market value? Apparently from Mr. Sell's standpoint, the cost is incurred to remodel the Property, but no benefit is obtained. That makes no sense. As pointed out by Mr. Morris, when a property is improved, it does have a separate effect on the value of the residence. Mr. Morris' report and his testimony support the proposition that the extensive remodeling of the Property did cause the Property to increase in value over the years separate from the inherent value of the Property.

Mr. Sell discusses several comparables in his report. However, his analysis of the other comparables is similar to his analysis

---

31. All calculations are found in Exhibit 1 at 17.

32. *Id.*

33. *See* Exhibit B at 2. All purchasers probably think they paid too much for the property they purchased.

34. *Id.*

35. *See* Exhibit 1 at 10, which outlines the extensive changes to the Property in 1993, 1994, and 2003.

of 7825 N. 6th Street.[36] He focuses on what adjustments he would make to the sale price of a comparable predicated on the amenities of the property, rather than how the particular improvement to the property, versus the Subject Property, would have an effect on the value. He also notes that many of the changes to the Subject Property were simply maintenance. Again, the Court disagrees. The nature of the changes to the Property, as described by the Debtor and Mr. Petersen, were vastly different and more complex than simple maintenance. Substantial changes were made to the kitchen and the master bedroom and bath area that upgraded the amenities of the Property. Such improvements separately added to the value of the Property other than its inherent value. Thus, the Court rejects the conclusions of Mr. Sell that the amount of $195,000 should be accorded solely to market factors inherent to the Property, with no value ascribed to the improvements to the Property, over the time frame from 1993 to 2004.[37]

Returning to the comparable sale at 7825 N. 6th Street, which both experts analyzed in their reports, the Court concludes that the comparable was of similar age as the Property and was located in close proximity to the Property. The comparable appreciated in value from 1999 to 2002 based solely on market conditions inherent to the Property. Those market conditions were approximately 5.44 per-

cent per year.[38] Mr. Sell notes that the market was not greatly appreciating in the 1990s, with the appreciation being de minimus in 1993.[39] Thus, the Court will start with a market appreciation inherent to the Property of .6 percent in 1993, increasing to 2 percent for 1994 and 1995, then increasing to 3 percent for 1996 through 1999, and 5.44 percent from 2000 to 2002.[40] The Court will also utilize Mr. Sell's approach that market conditions caused an increase in the value of residences in the area of 6.3 percent in 2003 and 8.4 percent in 2004.[41] However, since the Subject Property was sold by March 1, 2004, the Court will only utilize two/twelfths or one sixth of the appreciation of 2004 in its analysis.

The Court has analyzed the market appreciation as follows:

| | |
|---|---|
| 1993 | .6 (point 6) percent of $180,000 or $1,080 = $181,080 |
| 1994 and 1995 | 2 percent per year or $7,316 = $188,396 [42] |
| 1996 through 1999 | 3 percent per year for 4 years or $5652, $5821, $5996, plus $6176 = $23,645 plus $188,396 = $212,041 |
| 2000 through 2002 | 5.44 percent per year for 3 years or $11,535, $12,163, plus $12,824 = $36,522 plus $212,041 = $248,563 |
| 2003 | 6.3 percent for the year = $15,659 plus $248,563 = $264,222 |
| 2004 | 8.4 percent for the year = $22,195 × 1/6 (Since home was sold at end of February) = $3699 plus $264,222 = $267,921. |

■ The Court concludes that if the Subject Property sold in 2004 for $430,000, the appreciation due to market conditions alone (inherent value of the Property)

---

36. *See* Exhibit B at pp. 11–12.

37. *Id.* 47.

38. Testimony of Mr. Morris at trial.

39. *Id.* at 33.

40. The Court has arrived at these percentages based upon the reports of both experts. Also see Exhibit B, at 10 pages in (Page 1 of 6 of Uniform Appraisal Report), and at p. 42, Area 10 on Table.

41. *Id.* at 33.

42. The Court took 2 percent of $181,080, which is $3,622, then increased the value of the Property to $184,702, then took 2 percent on that amount, which is $3,694, for a total increase in value of $7,316 of the Property. The Court has used a similar analysis in the remainder of its computations.

would have been the increase from $180,000 to $267,921 or the amount of $87,921. The balance of the increase in value, based upon Mr. Morris' testimony, is a result of the improvements made to the Property over the years and the increase in value due solely to those improvements. In this matter, said computation would be $430,000 minus $267,921 or the amount of $162,079. Thus, although the Court shall give more weight to the report of Mr. Morris, it cannot accept his conclusion. The Court concludes that the marital community should be entitled to the sum of $162,079 for the increase in the value of the Property over the years due solely to the improvements from community funds. However, since the bankruptcy estate is only entitled to one-half of that amount, the other half being appreciation that would enure to the benefit of Mr. Petersen, the final figure is $162,079 times ½ = $81,040.

### 2. The Setoffs

On remand, this Court considered what setoffs Mr. Petersen should be entitled to as result of the payments made by him during the course of the parties' marriage or the domestic relations proceedings. As brought out on cross examination, one of the Court's concerns was that Mr. Petersen never asserted any claim for a setoff or setoffs in any document that he filed with the bankruptcy court during the administration of this case. Yet Mr. Petersen was listed as a creditor on the Debtor's schedules,[43] and given ample opportunity to assert such a claim. Initially the Court's reaction was to disallow any setoff for expenses paid, because of the lack of evidence provided by Mr. Petersen. However, as will be analyzed below,

Mr. Petersen has provided some evidence to the Court to support at least a few of his claims for setoff.

#### a. Credit for $2,600 in school expenses.

■ Mr. Petersen, at trial, conceded that he did not have an order from the domestic relations proceedings commenced by the Debtor which accorded him a setoff for the $2,600 in school expenses. He also conceded that he claimed his children as dependents, and received a tax credit for them, in 2000, 2001, and 2002. Given the lack of documentation to support Mr. Petersen's claim, and the separate State Court Order that Mr. Petersen pay a certain amount in support,[44] the Court sees no basis to grant Mr. Petersen any credit for the school expenses, particularly in light of the tax credit that he has already received in 2000, 2001, and 2002. Mr. Petersen has failed to meet his burden of proof on this expense.

#### b. Credit for money paid to the Debtor from a bank account.

■ Mr. Petersen has provided evidence that the Superior Court did order a distribution of community funds from one of the deposit accounts maintained during the marriage with the Debtor in 2000.[45] He also provided a check which reflected that he paid $2,000 of the required $4,000 payment on June 25, 2000.[46] However, Mr. Petersen testified that the balance of the $2,000 that he was required to pay pursuant to the Superior Court Minute Entry Order was paid through his expending funds for his children to travel to San Diego. Mr. Petersen has no documentation reflecting such a trip or that he paid that much money for his children on that

---

**43.** See Exhibit 16.

**44.** See Exhibit D at 2.

**45.** Id. at 5.

**46.** See Exhibit J.

trip. However, more importantly, the Superior Court directed that he pay the Debtor from the deposit account maintained during the marriage. There is nothing in the Court Order which allows Mr. Petersen to claim any kind of credit for travel with his children. Since Mr. Petersen was only able to show that he paid $2,000 of the $4,000 that was ordered by the Court, the Court will only give him a credit of $2,000.

### c. Credit for unauthorized checks.

■ Mr. Petersen testified that the Debtor obtained funds, on an unauthorized basis, from a deposit account which consisted of Mr Petersen's sole and separate property. Mr. Petersen presented the checks from the account which he alleged were unauthorized withdrawals by the Debtor.[47] However, as at the first trial before this Court, Mr. Petersen has not provided any evidence that the funds in that account were indeed his sole and separate property. In fact, the Superior Court Minute Entry reflects that the State Court contemplated that the funds in the deposit account were community funds, since it ordered that Mr. Petersen provide one-half of the funds on deposit to the Debtor.[48] However, the Court notes that the Debtor did withdraw the funds from the deposit account just prior to her commencing the domestic relations proceedings against Mr. Petersen.[49] Given the timing of the withdrawal and the lack of credit to Mr. Petersen in the Superior Court Minute Entry, this Court will allocate to the Debtor and give Mr. Petersen a credit for one-half of the funds that the Debtor withdrew just prior to the divorce proceedings for which the Superior Court made no findings.[50] Thus, Mr. Petersen shall be accorded a credit of ½ times $2825, which is equal to $1,412.50.

### d. Credit for $1,400 loan.

■ The Court is still at a loss as to this credit claimed by Mr. Petersen. Initially Mr. Petersen testified that a promissory note in the amount of $1,400 was executed by the Debtor, that the Note was his sole and separate property, and that the Debtor had not repaid him. However, Mr. Petersen provided no evidence of such a Note. A note that he did provide was in the amount of $13,428, which was executed by the Debtor.[51] However, there is no indication as to what remains unpaid on this note, and there is no indication as to whether the note is community property or the sole and separate property of Mr. Petersen. Finally, the note does not match the request for reimbursement of $1,400. The difficulty of assuming that such an obligation is still due and owing was brought out by the Trustee's special counsel in her examination of Mr. Petersen. Counsel noted that Mr. Petersen had commenced another proceeding against the Debtor in 2001, seeking $23,587.87 in loans that Mr. Petersen had allegedly made to the Debtor which constituted his sole and separate property for which he should be repaid.[52] However, the Superior Court ultimately entered a minute entry, noting

47. See Exhibit G.

48. See Exhibit D.

49. The Debtor served the divorce papers on Mr. Petersen on April 10, 2000. See Memorandum Decision, Docket Entry No. 11 at p. 2.

50. See Exhibit 6. Check No. 1136 was made payable to Dawn Petersen in the amount of $2,825 just prior to her serving Mr. Petersen with the documentation commencing the divorce proceedings.

51. See Exhibit F.

52. See Exhibit 7.

that the nature and the amount of at least one obligation that Mr. Petersen claimed as his sole and separate property had not been resolved and whether it was a community obligation or a sole and separate obligation would be resolved in the domestic relations proceedings.[53]

Again, Mr. Petersen carried the burden of proof on the nature, extent, and amount of this setoff. The Court is still unclear as to whether such an obligation still exists, the amount of the obligation, and whether it is a community obligation or the sole and separate obligation owed to Mr. Petersen. The Court will not give Mr. Petersen any setoff for this obligation.

e. *Credit for $9,559.85 for paying the Debtor's obligations.*

■ Mr. Petersen relies on documentation from 1993 reflecting that he repaid various credit card obligations of the Debtor at the commencement of their marriage for which he is now entitled to reimbursement. Mr. Petersen and the Debtor did execute a promissory note in 1993 in the amount of $10,443.00 in favor of Sun Country Financial Services.[54] However, there is nothing to indicate that this is the repayment of a sole and separate obligation of the Debtor. Although Mr. Petersen testified that the Debtor conceded that this was her sole and separate obligation and made payments on the obligation each month, there is no evidence to support these assertions. The presumption is that the obligation was incurred by the community and repaid through community funds. *Schlaefer v. Financial Management Service, Inc.,* 196 Ariz. 336, 996 P.2d 745 (App. Div.1 2000); *MacCollum v. Perkinson,* 185 Ariz. 179, 913 P.2d 1097 (App. Div.1 1996);

*Garrett v. Shannon,* 13 Ariz.App. 332, 476 P.2d 538 (1970).

It also appears that Mr. Petersen decided to refinance all of the debt on the Subject Property in December of 1996. At that time, Mr. Petersen acquired a loan from Alliance West to repay the obligations then owing to Western Bank, with a first lien on the Property, and Bank One Financial, which had a second lien on the Property.[55] However, there is no indication that the Sun Country obligation was subsequently acquired by Bank One. Moreover, the documentation reflecting the refinancing states that Mr. Petersen was acting on behalf of his sole and separate property and incurring the obligations as his sole and separate obligations. The Debtor did not execute any of the documentation concerning this refinancing.[56] Thus, Mr. Petersen has failed to meet his burden of proof that he should receive any setoff for this refinancing in 1996.

### IV. Conclusion.

The Court has considered the issues remanded to it in light of the proceedings which have occurred in this Court since the remand order from the District Court. Since this Court's judgment was vacated by the District Court, but not all of the issues were considered on appeal, the Court has restated its findings of fact and conclusions of law from its first decision as modified by subsequent proceedings before the District Court and this Court.

The parties did not dispute this Court's finding in its initial decision that they utilized the sum of $8,432.40 of community funds to make the mortgage payments on the Property. Therefore, that finding is

53. *Id.*

54. *See* Exhibit H.

55. *Id.*

56. *Id.*

adopted again by this Court.[57] The parties agreed that the bankruptcy estate's interest in the IRA was 19 percent of the value of the IRA. As of September 27, 2002, the value of the IRA was $59,835.46. Mr. Petersen also had a cash management account which was fully funded with community funds, and had a value as of September 27, 2002, in the amount of $11,778.24. The Court, thus, concluded that the bankruptcy estate was entitled to one-half of this account, which is the sum of $5,889.12.

The balance in the Wells Fargo account on the date that the divorce papers were served was $18,034.22; one-half of those funds, or the sum of $9,017.11 will be designated for the benefit of the bankruptcy estate. Additionally, the Court concluded that Mr. Petersen was entitled to his one-half share in the business sold by the Debtor, or the sum of $24,000.

The Court also finds that the marital community should be entitled to the sum of $162,079 for the increase in the value of the Property over the years due solely to the improvements from community funds. However, since the bankruptcy estate is only entitled to one-half of that amount, the other half being appreciation that would enure to the benefit of Mr. Petersen, the final figure is $162,079 times ½ = $81,040.

Based upon an allocation of assets and liabilities, Mr. Petersen owes the bankruptcy estate the following:

| | | |
|---|---|---|
| 1. | 1/2 of community funds used to pay mortgage on 841 E. Desert Park Lane, Phoenix | $ 4,216.00 |
| 2. | 19% of the IRA Account | $ 11,368.74 |
| 3. | 1/2 of the Cash Management Account | $ 5,889.12 |
| 4. | 1/2 of the Wells Fargo Account | $ 9,017.11 |
| 5. | 1/2 of the appreciation done to the improvements at 841 E. Desert Park Lane, Phoenix | $ 81,040.00 |
| | Total: | $111,530.97 |

57. *See* Memorandum Decision, Docket Entry No. 11 at pp. 8–9 and District Court Decision,

Mr. Petersen shall receive the following credits against the sum of $111,530.97 that he owes to the bankruptcy estate:

| | | |
|---|---|---|
| 1. | 1/2 of the sum that the Debtor received from the sale of her business | $24,000.00 |
| 2. | Deposit Account credit | $ 2,000.00 |
| 3. | Credit for 1/2 of Check for funds withdrawn by the Debtor at time of divorce proceedings | $ 1,412.50 |
| | Total: | $27,412.50 |

$111,530.97 minus $27,412.50 equals the amount of $84,118.47 still owed by Mr. Petersen to the bankruptcy estate.

Special Counsel to the Trustee shall submit a form of judgment to the Court.